# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

Amerisure Mutual Insurance Company,

    Plaintiff,

v.

Transatlantic Reinsurance Company,

    Defendant.

Case No.

## COMPLAINT

Plaintiff Amerisure Mutual Insurance Company ("Amerisure"), by its attorneys, alleges for its complaint against Defendant Transatlantic Reinsurance Company ("TransRe") as follows:

## NATURE OF ACTION

1. This is a civil action for (i) breach of a facultative reinsurance agreement between the parties that arises from TransRe's failure to indemnify Amerisure for certain loss and loss related expenses incurred in connection with claims brought against a Michigan insured, and (ii) for a declaration of rights under that agreement and another facultative reinsurance agreement.

2. Amerisure seeks money damages and declaratory relief.

## PARTIES

3. Amerisure, formerly known as Michigan Mutual Insurance Company ("Michigan Mutual"), is organized under the laws of the State of Michigan and has its principal place of business in Farmington Hills, Michigan.

4. TransRe is organized under the laws of the State of New York and has its principal place of business in New York, New York.

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1332(a), jurisdiction is based on diversity of citizenship. Amerisure and TransRe are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over TransRe because TransRe has transacted and continues to transact the business of reinsurance with Amerisure in the State of Michigan, TransRe issued facultative reinsurance contracts to Amerisure that are substantially connected with the State of Michigan because, as demonstrated below, *inter alia*, the risk reinsured is located in Michigan, and TransRe is licensed to transact the business of insurance in the State of Michigan.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Amerisure's principal place of business is located in this District, a substantial part of the events, acts, and/or omissions giving rise to the claim occurred in this District, and TransRe is subject to the Court's personal jurisdiction with respect to this action.

## BACKGROUND

### The Business and Nature of Reinsurance

8. Reinsurance involves a transaction whereby an insurance company (the "cedent" or "reinsured") transfers a portion of premium it has received under certain insurance policies issued to its insureds and a share of concomitant risk to another insurance company (the "reinsurer") in respect of financial exposure resulting from the risks underwritten by the cedent in the policies.

9. In this case, Amerisure is the cedent and TransRe is the reinsurer.

10. At all times material, Armstrong Machine Works, Armstrong Video Products A Division of Armstrong Machine Works ("Armstrong"), Three Rivers, Michigan, was insured

under primary and umbrella liability insurance policies that Amerisure issued directly to Armstrong and are described further below. As further demonstrated below, TransRe reinsured the risk and liability arising under those Armstrong policies.

11. By entering into reinsurance agreements, the cedent "cedes" or spreads its risk of loss to one or more reinsurers. Such spreading of risk permits a cedent to, among other things, minimize exposure to catastrophic loss, reduce the amount of reserves held for the protection of policyholders, and increase the capacity to underwrite additional insurance.

12. There are two types of reinsurance: treaty and facultative. Under a reinsurance treaty, the cedent transfers a percentage of its risk under a line or lines of business across its portfolio of insurance policies to one or more reinsurers.

13. Facultative reinsurance—the type of reinsurance at issue in this dispute—is reinsurance of a single underlying policy or risk. The cedent agrees with the reinsurer to transfer some or all of the insured risk the cedent has assumed from its insured.

14. Facultative reinsurance is distinguished from treaty reinsurance in that, *inter alia*, the reinsurer has a full and fair opportunity to evaluate, underwrite, and accept or reject the underlying insured risk, including the underlying insurance policy or policies.

15. Facultative reinsurance is generally memorialized in a written contract known as a facultative certificate. A facultative certificate generally has certain identified "declarations" on the cover or front side of the agreement, "general conditions" on the reverse side, and may include by attachment or reference by incorporation certain endorsement pages and/or a copy of the underlying insurance policy.

16. The "following liability" clause in a facultative certificate obligates the reinsurer to indemnify the cedent in accordance with the terms and conditions of the policy reinsured,

except with respect to terms and conditions as may be inconsistent with the terms of the facultative certificate. Another word for such consistency is "concurrency."

17. Concurrency between the facultative certificate and the reinsured policy assures the ceding company that by purchasing reinsurance, it has covered the same liability and obligations through the reinsurance agreement that it has undertaken on behalf of the original insured under its own policy or policies directly.

18. Where the underlying policy provides certain coverage or benefits to the insured customer, the facultative certificate generally applies in the same way.

19. At all times material, it has been the custom and practice of the insurance business community that payment of loss is subject to specified limits, but associated expenses are covered in addition to such limits, unless specifically stated otherwise.

## The Armstrong Insurance Program

20. Armstrong manufactured and distributed steam traps, which were typically attached to boilers on ships and in large buildings. The steam trap included certain parts manufactured by other parties, including an enclosed asbestos-containing gasket.

21. Armstrong's commercial insurance program includes primary and umbrella or excess policies that a number of insurers issued on an annual or multi-year basis, and extended across decades.

22. Michigan Mutual (now Amerisure) issued primary, or primary and umbrella, policies to Armstrong between 1976 and 1990. A primary policy covers from the first dollar up to the exhaustion of the policy limits; an umbrella policy affords additional coverage in addition to and/or above the primary policy limits, which is commonly referenced as underlying insurance, and sometimes provides additional primary coverage for certain claims not already covered by the underlying insurance.

23. At all times material, the general liability and umbrella insurance policies that Michigan Mutual issued to Armstrong provided for payment of expenses *in addition to limits,* until limits exhaustion.

24. Michigan Mutual issued Armstrong a general liability insurance policy (a type of primary insurance) for the period January 1, 1980 to January 1, 1983 as part of a "Multi Peril" insurance cover. True and correct copies of (i) Multi Peril reference pages, including Schedules of Underlying insurance for Umbrella Policy coverage referenced below, are attached hereto as Exhibit 1; (ii) the Michigan Mutual Comprehensive General Liability Policy ("GL Policy") issued at the time is attached hereto as Exhibit 2; and (iii) Endorsement MMI-202B is attached as Exhibit 3.

25. Each year of the three year period of Amerisure's general liability insurance coverage of Armstrong included, among other things, annual loss coverage for "Bodily Injury Liability" of "$500,000 each occurrence" and "$1,000,000 aggregate." "Aggregate" generally refers to the total amount for damages which may be paid under an insurance policy regardless of the number of occurrences.

26. The GL Policy provides "Supplementary Payments" and that the "Company will pay, *in addition to the applicable limit* of liability . . . all expenses incurred by the Company." The duty to defend and pay expenses—which do not reduce the policy limits—ends upon exhaustion that results from the payment of covered judgments or settlements. Ex. 2 at 3 (emphasis added).

27. The GL Policy underlies a Michigan Mutual umbrella liability policy effective from January 1, 1981 to January 1, 1982, and a Michigan Mutual umbrella liability policy effective from January 1, 1982 to January 1, 1983. True and correct copies of the 1981 and 1982

umbrella liability policy declarations ("1981 Umbrella Declarations" and "1982 Umbrellas Declarations") are attached hereto as Exhibits 4 and 5, respectively. A declarations page provides a general summary of the insurance and includes the named insured, policy period, policy limits, and other information that varies from insured to insured.

28. The 1981 Umbrella Declarations evidence coverage of $15 million in per occurrence and aggregate limits, which lie over or "in excess of" the GL Policy limits. A true and correct copy of the umbrella liability policy that Michigan Mutual issued in 1981 and 1982 (the "Umbrella Policy") is attached hereto as Exhibit 6.

29. The 1982 Umbrella Declarations evidence coverage of $30 million in per occurrence and aggregate limits, and is also in excess of the GL Policy.

30. The Umbrella Policy covers payments to indemnify the insured for "ultimate net loss" in excess of the underlying limits for amounts the insured shall be legally obligated to pay by reason of the liability imposed by law because of bodily injury. Ex. 6 at 2, ¶ 1. Specifically, "ultimate net loss" is defined as:

> [T]he sum the Insured or any company as his insurer or both become obligated to pay by reason of bodily injury, property damage, personal injury or advertising injury either through adjudication or compromise, after making proper deductions for all recoveries and salvages collectable, including the following [claimed] expenses: hospital, medical and funeral charges and court costs, premium on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons and for litigation, settlement, adjustment and investigation occurrence covered by this policy, excluding only the salaries of the insured's the company's or any underlying insurer's permanent employees. Ultimate net loss does not include expenses which are covered by other valid and collectible insurance or which are covered under Insuring Agreement 2 of this policy.

*Id.* at 4, ¶ 8.

31. Separately, the Umbrella Policy directs that with respect to any claim or suit alleging bodily injury for which the underlying insurer (here, Amerisure under the GL Policy)

has no further duty to defend, due to exhaustion by reason of "losses paid, . . . [Michigan Mutual] shall defend any suit against the insured," and pay all expenses incurred by Michigan Mutual "*in addition to* the amount payable under the ultimate net loss."  Ex. 6 at 2, ¶ 2 (emphasis added).

32. Like the GL Policy, the expenses incurred by Amerisure under the Umbrella Policy *do not erode the limits* declared in the 1981 or 1982 Umbrella Declarations.

### TransRe's Facultative Reinsurance Contracts

33. For the period January 1, 1981 to January 1, 1982, and the period January 1, 1982 to January 1, 1983, Michigan Mutual entered into two facultative reinsurance contracts (collectively the "Facultative Certificates") with TransRe to transfer some of the risk and/or liability from the 1981 and 1982 Umbrella Policies issued to Armstrong.  True and correct copies of Certificate No. C81-36268 ("1981 Facultative Certificate") and Certificate No. C82-38184 ("1982 Facultative Certificate") are attached hereto as Exhibits 7 and 8, respectively.

34. The Facultative Certificates identify the ceding company as Michigan Mutual and the insured as Armstrong, and the type of insurance as umbrella liability.

35. The 1981 Facultative Certificate was a new agreement between the parties, and the 1982 Facultative Certificate was a renewal of the coverage provided under the 1981 Facultative Certificate.

#### *The 1981 Facultative Certificate Declarations*

36. Item 2 of the 1981 Facultative Certificate's Declarations identifies the "Policy Limits and Applications" (referring to the 1981 Umbrella Declarations) as "$15,000,000 each occurrence and in the aggregate, where applicable, excess of primary."

37. Item 3 identifies Michigan Mutual's "Retention" as "50,000 part of 1,000,000 each occurrence and in the aggregate where applicable excess of primary."  A retention, like a

deductible, is the net amount of risk the cedent keeps and must pay for its own account before it may recover under the reinsurance agreement.

38. Item 4 identifies the "Reinsurance Accepted" as "2,000,000 P/O 4,000,000 each occurrence and in the aggregate where applicable excess of 1,000,000 each occurrence and in the aggregate where applicable excess of primary."

### *The 1982 Facultative Certificate Declarations*

39. Item 2 of the 1982 Facultative Certificate's Declarations identifies the "Policy Limits and Applications" (referring to the 1982 Umbrella) as "$30,000,000 each occurrence and in the aggregate, where applicable, excess of primary."

40. Item 3 identifies Michigan Mutual's "Retention" as "Primary and 50,000 part of 1,000,000 each occurrence and in the aggregate where applicable, excess of primary."

41. Item 4 identifies the "Reinsurance Accepted" per Endorsement 1 in a "Layer A" and a "Layer B."

42. The Reinsurance Accepted in Layer A is indicated as "$2,000,000 part of $15,000,000 each occurrence and in the aggregate, where applicable, excess of $5,000,000 each occurrence and in the aggregate, where applicable, excess of primary."

43. The Reinsurance Accepted in Layer B is indicated as "$2,000,000 part of $10,000,000 each occurrence and in the aggregate, where applicable, excess of $20,000,000 each occurrence and in the aggregate, where applicable, excess of primary."

### *1981 and 1982 Facultative Certificate Identity of Terms*

44. But for the Certificate "Items" referenced in the preceding paragraphs and endorsements, the 1981 and 1982 Facultative Certificates are virtually identical.

45. Item 5 in both Certificates identifies the "Basis of Reinsurance" as "Contributing Excess." "Contributing Excess" is defined by the Facultative Certificate's General Conditions: "The Company's policy applies in excess of other valid insurance, reinsurance or a self-insured retention and the limit of liability of the Reinsurer applies proportionately to all loss settlements in the percentage(s) set forth in Item 4 of the Declarations." Exs. 7 and 8 at 2, ¶ 10.

46. The Facultative Certificates contain a "following" clause which provides that TransRe's liability "shall follow the ceding Company's [Michigan Mutual's] liability in accordance with the terms and conditions of the policy insured hereunder except with respect to those terms and/or conditions as may be inconsistent with the terms of this certificate." Exs. 7 and 8 at 2, ¶ 1.

47. Accordingly, TransRe's liability follows Amerisure's obligations under the Umbrella Policy in the 1981 and 1982 Facultative Certificates, and the Umbrella Policy, subject to the terms and conditions of the GL Policy, continues in force upon the exhaustion of the GL Policy. Ex. 6 at 2, ¶ 3.

48. Regarding payment of TransRe's obligations, paragraph 3(c) of the Facultative Certificates' General Conditions directs that "Upon receipt by Reinsurer of satisfactory evidence of payment of loss for which reinsurance is provided hereunder, Reinsurer shall promptly reimburse the Company for *its share* of the loss *and* loss expense." Exs. 7 and 8 at 2, ¶ 3(c) (emphasis added).

49. The Facultative Certificates *separately define* "loss" and "loss expense." "Loss" is defined as "only such amounts as are actually paid by [Amerisure] in settlement of claims or in satisfaction of awards or judgments. *The term 'loss' shall not include loss expense*." Exs. 7 and 8 at 2, ¶ 3(d) (emphasis added).

50. The Facultative Certificates separately define "loss expense" as "all expenses incurred in the investigation, adjustment, settlement or litigation of claims, awards or judgments, including the salaries and expenses of [Amerisure's] staff adjusters but excluding the office expenses of [Amerisure] . . .." Exs. 7 and 8 at 2, ¶ 3(f).

51. The limit set out in Item 4 of the Facultative Certificates applies only to loss payments: "*the limits of liability of the Reinsurer . . . applies(y) only to that portion of the loss settlement*(s), in excess of the applicable retention of [Amerisure]." Exs. 7 and 8 at 2, ¶ 10 (emphasis added).

52. The foregoing terms and conditions are consistent with insurance business community custom and practice.

53. The Facultative Certificates follow the Umbrella Policy, which identically provides that defense costs are supplementary payments and are not subject to the liability limit; *i.e.,* defense costs and loss expense are in addition to liability limits.

54. Pursuant to the terms of the Facultative Certificates, TransRe is obligated to reimburse Amerisure for TransRe's portion of loss expenses *in addition to* loss payments, and the loss payments are the only payments to which the limits apply.

### The Claims Against Armstrong

55. The 1990s, asbestos claims were filed against Armstrong and other defendants in Michigan. Armstrong later was sued in asbestos litigation nationwide.

56. Amerisure and Armstrong have been parties to cost sharing arrangements with various other Armstrong primary and umbrella / excess insurers specifically for addressing loss and loss expenses in respect of such claims.

57. Amerisure has made payments for which it is obligated under its policies, including its 1981 and 1982 Umbrella Policies, to Armstrong, and is obligated to continue to make payments in the future.

58. Liability for payments made in respect of Armstrong's claims and for related expense have been allocated across the years of its available coverage from various insurers.

59. Allocated amounts for payments of loss and loss expense to Armstrong under the terms of the GL Policy underlying the 1981 and 1982 Umbrella Policies have exhausted the limits of that policy.

### Amerisure's Notice of Loss and Reinsurance Invoices to TransRe

60. Amerisure provided a Notice of Loss to TransRe on March 26, 2014 ("Notice of Loss"), including a narrative of the Armstrong products liability loss and loss expense history, for each of the 1981 and 1982 Facultative Certificates. A true and correct copy of the Notice of Loss without the narrative is attached as Exhibit 9.

61. Thereafter, on a regular basis, Amerisure presented to TransRe claim status reports for the Armstrong policies, and has continued to do so.

62. On January 26, 2017, after Amerisure paid the first $1 million in loss settlements under the 1981 Umbrella Policy, in addition to related loss expenses, and nearly three years after Amerisure delivered the Notice of Loss to TransRe, Amerisure sent TransRe an invoice under the 1981 Facultative Certificate in the amount of $105,279.84. A true and correct copy of the invoice is attached as Exhibit 10.

63. The invoice requested TransRe's 50% share of "Paid Loss" (which applies to the next $4 million of loss payments under the 1981 Umbrella Policy) above the first $1 million paid by Amerisure, which totaled $32,894.50. The invoice also requested TransRe's prorated share of loss expense, which totaled $72,385.34.

64. TransRe did not pay the invoice, nor did it pay later invoices it received from Amerisure.

65. Amerisure's invoice delivered on January 30, 2018, requested a total due under the 1981 Facultative Certificate of $762,088.53, comprised of $246,784.50 for Paid Loss and $515,304.03 for Paid Loss Expense.

66. TransRe has not paid any invoices for amounts due in respect of TransRe's share of both loss and loss expense under the 1981 Facultative Certificate.

67. As of the date of this Complaint, the outstanding principal balance due to Amerisure from TransRe under the 1981 Facultative Certificate is $935,574.41.

68. Amerisure is informed by its experience with Armstrong claims, and therefore believes that amounts will be due under the 1982 Facultative Certificate.

## TransRe Contends that Loss Expense Erodes Limits

69. TransRe asserts that the "Reinsurance Accepted" provisions of each of the Facultative Certificates provides for a limit to the amount that may be paid under the agreements, regardless of whether the limits are reached by payment of loss or loss expense.

70. Because the terms of the Facultative Certificates which follow the Umbrella Policies provide otherwise, the parties are in a dispute as to the extent of the obligations that TransRe owes under the Facultative Certificates.

## COUNT I
## Breach of Contract

71. Amerisure repeats and incorporates by reference the allegations set forth in paragraphs 1 through 70 as if fully set forth herein.

72. Amerisure has fully performed its obligations under the 1981 Facultative Certificate and has properly billed TransRe for amounts due thereunder.

73. In breach of the 1981 Facultative Certificate, TransRe has refused to pay Amerisure's invoices.

74. As a result of TransRe's breach of the 1981 Facultative Certificate, Amerisure has suffered damages and will continue to suffer damages until TransRe pays its invoiced obligations.

## COUNT II
### Declaratory Relief

75. Amerisure repeats and incorporates by reference the allegations set forth in paragraphs 1 through 70 as if fully set forth herein.

76. Amerisure will continue to make payments on Armstrong's behalf pursuant to the terms of the 1981 Umbrella Policy, and such payments will be subject to reimbursement in proportionate share from TransRe under the 1981 Facultative Certificate.

77. In failing to pay amounts due under the Facultative Certificate, TransRe has breached that contract and indicated an intention to continue to breach.

78. TransRe also rejects its obligation to pay its calculated share of loss expenses to the extent such amounts exceed the limits identified in the "Reinsurance Accepted" provisions of the Facultative Certificates (both 1981 and 1982).

79. In other words, TransRe asserts that once its Reinsurance Accepted limits have been paid, regardless of whether by payment of loss or loss expense, its obligation will end under either and both of the Facultative Certificates.

80. An actual and justiciable controversy exists between Amerisure and TransRe as to which the Court has jurisdiction to adjudge the parties' respective rights and obligations under the Facultative Certificates pursuant to 28 U.S.C. § 2201.

81. Amerisure is entitled to a judicial determination of the parties' rights and obligations under the Facultative Certificates, including a declaration that TransRe is obligated to pay Amerisure's future billings, and that such contracts are exhausted only by the payment of the "Reinsurance Accepted" limit by "loss" settlements, while the payment of "loss expense" must be paid in addition to such limits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amerisure Mutual Insurance Company requests that the Court enter judgment in its favor and against TransRe as follows:

A. Awarding the sum of $935,574.41 for amounts billed to Trans Re through March 31, 2018 under the 1981 Facultative Certificate;

B. Declaring that: (i) TransRe is obligated to pay future billings by Amerisure for its portion of Amerisure's payments under the 1981 Umbrella Policy reinsured pursuant to the 1981 Facultative Certificate; (ii) pursuant to both the 1981 and 1982 Facultative Certificates, TransRe is obligated to reimburse Amerisure for TransRe's portion of loss expenses in addition to loss payments; and (iii) the loss payments are the only payments to which the limits apply.

C. Awarding pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems just and proper.

Dated: June 21, 2018　　　　　　　　　Respectfully submitted,

**Amerisure Mutual Insurance Company,**

/s/ Lori McAllister
Lori McAllister (P39501)
DYKEMA GOSSETT PLLC
Capitol View Bldg.
201 Townsend Street
Suite 900
Lansing, MI 48933
517.374.9100
lmcallister@dykema.com

Stephen W. Schwab
Carl H. Poedtke III
Jamie L. Davis
(*Pro Hac Vice Forthcoming*)
DLA PIPER LLP (US)
444 West Lake Street
Suite 900
Chicago, IL 60606
312.368.4000
stephen.schwab@dlapiper.com
carl.poedtke@dlapiper.com
jamie.davis@dlapiper.com

*Attorneys for Plaintiff*