## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

AMERISURE MUTUAL INSURANCE
COMPANY,

        Plaintiff,

    v.

TRANSATLANTIC REINSURANCE
COMPANY,

        Defendant.

Case No. 18-CV-11966-SJM-SDD

Hon. Stephen J. Murphy, III

Mag. Stephanie Dawkins Davis

## SECOND AMENDED COMPLAINT

Plaintiff Amerisure Mutual Insurance Company ("Amerisure"), by its attorneys, alleges for its second amended complaint against Defendant Transatlantic Reinsurance Company ("TransRe") as follows:

## NATURE OF ACTION

1.    This is a civil action for (i) breach of a facultative reinsurance agreement between the parties that arises from TransRe's failure to indemnify Amerisure for certain loss and loss related expenses incurred in connection with claims brought against a Michigan insured, (ii) a declaration of rights under that agreement and another facultative reinsurance agreement, (iii) bad faith, and (iv) violation of N.Y. Gen. Bus. Law § 349.

2.    Amerisure seeks money damages, declaratory relief, punitive damages, and attorneys' fees and costs.

## PARTIES

3.    Amerisure, formerly known as Michigan Mutual Insurance Company ("Michigan Mutual"), is organized under the laws of the State of Michigan and has its principal place of

business in Farmington Hills, Michigan.

4.     TransRe is organized under the laws of the State of New York and has its principal place of business in New York, New York.

## JURISDICTION AND VENUE

5.     Pursuant to 28 U.S.C. § 1332(a), jurisdiction is based on diversity of citizenship. Amerisure and TransRe are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     This Court has personal jurisdiction over TransRe because TransRe has transacted and continues to transact the business of reinsurance with Amerisure in the State of Michigan, TransRe issued facultative reinsurance contracts to Amerisure that are substantially connected with the State of Michigan because, as demonstrated below, *inter alia*, the risk reinsured is located in Michigan, and TransRe is licensed to transact the business of insurance in the State of Michigan.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Amerisure's principal place of business is located in this District, a substantial part of the events, acts, and/or omissions giving rise to the claim occurred in this District, and TransRe is subject to the Court's personal jurisdiction with respect to this action.

## BACKGROUND

### The Business and Nature of Reinsurance

8.     Reinsurance involves a transaction whereby an insurance company (the "cedent" or "reinsured") transfers a portion of premium it has received under certain insurance policies issued to its insureds and a share of concomitant risk to another insurance company (the "reinsurer") in respect of financial exposure resulting from the risks underwritten by the cedent in the policies.

9.     In this case, Amerisure is the cedent and TransRe is the reinsurer.

10.     At all times material, Armstrong Machine Works, Armstrong Video Products A Division of Armstrong Machine Works ("Armstrong"), Three Rivers, Michigan, was insured under primary and umbrella liability insurance policies that Amerisure issued directly to Armstrong and are described further below.  As further demonstrated below, TransRe reinsured the risk and liability arising under certain umbrella policies.

11.     By entering into reinsurance agreements, the cedent "cedes" or spreads its risk of loss to one or more reinsurers.  Such spreading of risk permits a cedent to, among other things, minimize exposure to catastrophic loss, reduce the amount of reserves held for the protection of policyholders, and increase the capacity to underwrite additional insurance.

12.     There are two types of reinsurance: treaty and facultative.  Under a reinsurance treaty, the cedent transfers a percentage of its risk under a line or lines of business across its portfolio of insurance policies to one or more reinsurers.

13.     Facultative reinsurance—the type of reinsurance at issue in this dispute—is reinsurance of a single underlying policy or risk.  The cedent agrees with the reinsurer to transfer some or all of the insured risk the cedent has assumed from its insured.

14.     Facultative reinsurance is distinguished from treaty reinsurance in that, *inter alia*, the reinsurer has a full and fair opportunity to evaluate, underwrite, and accept or reject the underlying insured risk, including the underlying insurance policy or policies.

15.     Facultative reinsurance is generally memorialized in a written contract known as a facultative certificate.  A facultative certificate generally has certain identified "declarations" on the cover or front side of the agreement, "general conditions" on the reverse side, and may include by attachment or reference by incorporation certain endorsement pages and/or a copy of the underlying insurance policy.

16.     The "following liability" clause in a facultative certificate obligates the reinsurer to indemnify the cedent in accordance with the terms and conditions of the policy reinsured, except with respect to terms and conditions as may be inconsistent with the terms of the facultative certificate.  Other words describing such consistency are "concurrent" and "coextensive."

17.     Concurrency or coextension between the facultative certificate and the reinsured policy assures the ceding company that by purchasing reinsurance, it has covered the same liability and obligations through the reinsurance agreement that it has undertaken on behalf of the original insured under its own policy or policies directly.

18.     Where the underlying policy provides certain coverage or benefits to the insured customer, the facultative certificate generally applies in the same way.

19.     At all times material, it has been the custom and practice of the insurance business community that payment of loss is subject to specified limits, but associated expenses are covered in addition to such limits, unless specifically stated otherwise.

**The Armstrong Insurance Program**

20.     Armstrong manufactured and distributed steam traps, which were typically attached to boilers on ships and in large buildings.  The steam trap included certain parts manufactured by other parties, including a fully encapsulated, non-friable asbestos-containing gasket. OSHA and the EPA did not regard such a product as posing any kind of health challenge until the end of the 1980s.

21.     Armstrong's commercial insurance program includes primary and umbrella or excess policies that a number of insurers issued on an annual or multi-year basis and extended across decades.

22.     Michigan Mutual (now Amerisure) issued primary, or primary and umbrella, policies to Armstrong between 1976 and 1990, adding 14 years of primary and umbrella coverage

4

to the previous 30 years provided by Wausau and Nationwide.  A primary policy covers from the first dollar up to the exhaustion of the policy limits; an umbrella policy affords additional coverage in addition to and/or above the primary policy limits, which is commonly referenced as "underlying" insurance, and sometimes provides additional primary coverage for certain claims not already covered by the underlying insurance.

23.     At all times material, the general liability and umbrella insurance policies that Michigan Mutual issued to Armstrong provided for payment of expenses *in addition to limits,* until limits exhaustion.

24.     Michigan Mutual issued Armstrong liability coverage (a type of primary insurance), as well as other coverages, for the period January 1, 1980 to January 1, 1983, as part of a "Special Multi-Peril Policy."  True and correct copies of (i) policy reference and schedule pages, including Schedules of Underlying Insurance for Umbrella Policy coverage referenced below, are attached hereto as Exhibit 1; (ii) the Special Multi-Peril Policy form (hereinafter referred to as the "Special Multi-Peril Policy" or "GL Policy") including the substantive provisions issued at the time is attached hereto as Exhibit 2, including Special Multi-Peril Policy Conditions and Definitions MP 00 90, and Comprehensive General Liability Insurance Endorsement MMI-202B.  The Special Multi-Peril Policy form attached was issued on a form dated "7-80", which was updated in July of 1980 for purposes of reflecting the signature of the company's new president (E.L. Cox) on the inside of the policy.  The form otherwise is as issued to policyholders at the beginning of 1980 for policyholders purchasing Special Multi-Peril Insurance coverage.

25.     Each year of the three-year period of Amerisure's general liability insurance coverage of Armstrong included, among other things, annual loss coverage for "Bodily Injury Liability" of "$500,000 each occurrence" and "$1,000,000 aggregate."  "Aggregate" generally

refers to the total amount for damages which may be paid under an insurance policy regardless of the number of occurrences.

26.     The GL Policy provided for "Supplementary Payments" and provided that the Company would pay, in addition to the applicable limit of liability for all damages, judgments or settlements, all expenses incurred by the Company in defending the insured, all costs taxed against the insured in any suit defended by the Company, and all interest on the entire amount of any judgment.  The duty to defend and pay expense, which do not reduce the policy limits, ends upon exhaustion that results from the payment of judgments or settlements.

27.     The GL Policy underlies a Michigan Mutual umbrella liability policy effective from January 1, 1981 to January 1, 1982, and a Michigan Mutual umbrella liability policy effective from January 1, 1982 to January 1, 1983.  True and correct copies of the 1981 and 1982 umbrella liability policy declarations ("1981 Umbrella Declarations" and "1982 Umbrella Declarations") are attached hereto as Exhibits 3 and 4, respectively.  A declarations page provides a general summary of the insurance and includes the named insured, policy period, policy limits, and other information that varies from insured to insured.

28.     The 1981 Umbrella Declarations evidence coverage of $15 million in per occurrence and aggregate limits, which lie over or "in excess of" the GL Policy limits.  A true and correct copy of the umbrella liability policy form that Michigan Mutual issued in 1981 and 1982 (the "Umbrella Policy") is attached hereto as Exhibit 5.

29.     The 1982 Umbrella Declarations evidence coverage of $30 million in per occurrence and aggregate limits and is also in excess of the GL Policy.

30.     The Umbrella Policy covers payments to indemnify the insured for "ultimate net loss" in excess of the underlying limits for amounts the insured shall be legally obligated to pay

by reason of the liability imposed by law because of bodily injury. Ex. 5 at 2, ¶ 1. Specifically, "ultimate net loss" is defined as:

> [T]he sum the Insured or any company as his insurer or both become obligated to pay by reason of bodily injury, property damage, personal injury or advertising injury either through adjudication or compromise, after making proper deductions for all recoveries and salvages collectable, including the following [claimed] expenses: hospital, medical and funeral charges and court costs, premium on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons and for litigation, settlement, adjustment and investigation occurrence covered by this policy, excluding only the salaries of the insured's the company's or any underlying insurer's permanent employees.

> Ultimate net loss does not include expenses which are covered by other valid and collectible insurance or which are covered under Insuring Agreement 2 of this policy.

*Id.* at 4, ¶ 8.

31.     The Umbrella Policy Insuring Agreement 2 "DEFENSE, SUPPLEMENTARY PAYMENTS" (b) directs that with respect to any claim or suit alleging bodily injury for which the underlying insurer [here, Amerisure under the GL Policy] has no further duty to defend due to exhaustion by reason of "losses paid thereunder" the Company shall "defend any suit against the insured," and pay all expenses incurred by the Company "*in addition to* the amount payable under the ultimate net loss," Ex. 5 at 2, ¶ 2 (emphasis added), which definition "does not include expenses . . . which are covered under Insuring Agreement 2 of this policy", *id.* at 4, ¶ 8.

32.     Like the GL Policy, the defense expenses incurred by Amerisure under the Umbrella Policy *do not erode the limits* declared in the 1981 or 1982 Umbrella Declarations.

**TransRe's Facultative Reinsurance Contracts**

33.     For the period January 1, 1981 to January 1, 1982, and the period January 1, 1982 to January 1, 1983, Michigan Mutual entered into two facultative reinsurance contracts (collectively the "Facultative Certificates") with TransRe to transfer some of the risk and/or liability from the 1981 and 1982 Umbrella Policies issued to Armstrong. True and correct copies

of Certificate No. C81-36268 ("1981 Facultative Certificate") and Certificate No. C82-38184 ("1982 Facultative Certificate") are attached hereto as Exhibits 6 and 7, respectively.

34.     The Facultative Certificates identify the ceding company as Michigan Mutual and the insured as Armstrong, and the type of insurance as umbrella liability.

35.     The 1981 Facultative Certificate was a new agreement between the parties, and the 1982 Facultative Certificate was a renewal of the coverage provided under the 1981 Facultative Certificate.

36.     TransRe drafted the Facultative Certificates. Any ambiguity in their terms, therefore, should be resolved against TransRe.

### The 1981 Facultative Certificate Declarations

37.     Item 2 of the 1981 Facultative Certificate's Declarations identifies the "Policy Limits and Applications" (referring to the 1981 Umbrella Declarations) as "$15,000,000 each occurrence and in the aggregate, where applicable, excess of primary."

38.     Item 3 identifies Michigan Mutual's "Retention" as "50,000 part of 1,000,000 each occurrence and in the aggregate where applicable excess of primary."  A retention, like a deductible, is the net amount of risk the cedent keeps and must pay for its own account before it may recover under the reinsurance agreement.

39.     Item 4 identifies the "Reinsurance Accepted" as "2,000,000 P/O 4,000,000 each occurrence and in the aggregate where applicable excess of 1,000,000 each occurrence and in the aggregate where applicable excess of primary."  The word "limit" does not appear there.

### The 1982 Facultative Certificate Declarations

40.     Item 2 of the 1982 Facultative Certificate's Declarations identifies the "Policy Limits and Applications" (referring to the 1982 Umbrella) as "$30,000,000 each occurrence and in the aggregate, where applicable, excess of primary."

41.     Item 3 identifies Michigan Mutual's "Retention" as "Primary and 50,000 part of 1,000,000 each occurrence and in the aggregate where applicable, excess of primary."

42.     Item 4 identifies the "Reinsurance Accepted" per Endorsement 1 in a "Layer A" and a "Layer B."  The word "limit" does not appear there.

43.     The Reinsurance Accepted in Layer A is indicated as "$2,000,000 part of $15,000,000 each occurrence and in the aggregate, where applicable, excess of $5,000,000 each occurrence and in the aggregate, where applicable, excess of primary."

44.     The Reinsurance Accepted in Layer B is indicated as "$2,000,000 part of $10,000,000 each occurrence and in the aggregate, where applicable, excess of $20,000,000 each occurrence and in the aggregate, where applicable, excess of primary."

### 1981 and 1982 Facultative Certificate Identity of Terms

45.     But for the Certificate "Items" referenced in the preceding paragraphs and endorsements, the 1981 and 1982 Facultative Certificates are virtually identical.

46.     Item 5 in both Certificates identifies the "Basis of Reinsurance" as "Contributing Excess."  "Contributing Excess" is defined by the Facultative Certificate's General Conditions: "The Company's policy applies in excess of other valid insurance, reinsurance or a self-insured retention and the limit of liability of the Reinsurer applies proportionately to all loss settlements in the percentage(s) set forth in Item 4 of the Declarations."  Exs. 6 and 7 at 2, ¶ 10 *Contributing Excess*.

47.     The General Conditions of both Certificates contain a "following" clause in paragraph 1 which provides that TransRe's liability "shall follow the ceding Company's [Michigan Mutual's] liability in accordance with the terms and conditions of the policy insured hereunder except with respect to those terms and/or conditions as may be inconsistent with the terms of this certificate." Exs. 6 and 7 at 2, ¶ 1.

48.     Accordingly, TransRe's liability follows Amerisure's obligations under the Umbrella Policy in the 1981 and 1982 Facultative Certificates, and the Umbrella Policy, subject to the terms and conditions of the GL Policy, continues in force upon the exhaustion of the GL Policy. Exs. 6 and 7 at 2, ¶ 3.

49.     Regarding payment of TransRe's obligations, paragraph 3(c) of the Facultative Certificates' General Conditions directs that "Upon receipt by Reinsurer of satisfactory evidence of payment of loss for which reinsurance is provided hereunder, Reinsurer shall promptly reimburse the Company for *its share* of the loss *and* loss expense." Exs. 6 and 7 at 2, ¶ 3(c) (emphasis added).

50.     The Facultative Certificates *separately define* "loss" and "loss expense." "Loss" is defined as "only such amounts as are actually paid by [Amerisure] in settlement of claims or in satisfaction of awards or judgments. *The term 'loss' shall not include loss expense*." Exs. 6 and 7 at 2, ¶ 3(d) (emphasis added).

51.     The Facultative Certificates separately define "loss expense" as "all expenses incurred in the investigation, adjustment, settlement or litigation of claims, awards or judgments, including the salaries and expenses of [Amerisure's] staff adjusters but excluding the office expenses of [Amerisure] . . .." Exs. 6 and 7 at 2, ¶ 3(f).

52.     The amount stated in Item 4 of the Facultative Certificates applies only to loss payments: "*the limits of liability of the Reinsurer . . . applies(y) only to that portion of the loss settlement*(s), in excess of the applicable retention of [Amerisure]."  Exs. 6 and 7 at 2, ¶ 10 *Excess of Loss* (emphasis added).

53.     The foregoing terms and conditions are consistent with insurance business community custom and practice.

54.     The Facultative Certificates follow the Umbrella Policy, which identically provides that defense costs are supplementary payments and are not subject to the liability limit; *i.e.,* defense costs and loss expense are in addition to liability limits.

55.     Pursuant to the terms of the Facultative Certificates, TransRe is obligated to reimburse Amerisure for TransRe's portion of loss expenses *in addition to* loss payments, and the loss payments are the only payments to which any limits apply.

## The Claims Against Armstrong

56.     During the 1990s, asbestos claims were filed against Armstrong and other defendants in Michigan.  Armstrong later was sued in asbestos litigation nationwide.

57.     Amerisure and Armstrong have been parties to cost sharing arrangements with various other Armstrong primary and umbrella / excess insurers specifically for addressing loss and loss expenses in respect of such claims.

58.     Amerisure has made payments for which it is obligated under its policies, including its 1981 and 1982 Umbrella Policies, to Armstrong, and is obligated to continue to make payments in the future.

59.     Liability for payments made in respect of Armstrong's claims and for related expense have been allocated across the years of its available coverage from various insurers, including but not limited to Amerisure.

60.     Allocated amounts for payments of loss and loss expense to Armstrong under the terms of the GL Policy underlying the 1981 and 1982 Umbrella Policies eventually exhausted the limits for each year.

### Amerisure's Notice of Loss and Reinsurance Invoices to TransRe

61.     Amerisure provided a Notice of Loss to TransRe on March 26, 2014 ("Notice of Loss"), including a narrative of the Armstrong products liability loss and loss expense history, for each of the 1981 and 1982 Facultative Certificates.  A true and correct copy of the Notice of Loss without the narrative is attached as Exhibit 8. Until then, Amerisure did not reasonably believe that Armstrong losses might result in a claim against TransRe under the Facultative Certificates.

62.     Thereafter, on a regular (calendar quarterly) basis, Amerisure presented to TransRe claim status reports for the Armstrong policies with supplemental information about the Armstrong losses, and has continued to do so.

63.     On January 26, 2017, after Amerisure paid the first $1 million in loss settlements under the 1981 Umbrella Policy, in addition to related loss expenses, and nearly three years after Amerisure delivered the Notice of Loss to TransRe, Amerisure sent TransRe an invoice under the 1981 Facultative Certificate in the amount of $105,279.84.  A true and correct copy of the invoice is attached as Exhibit 9.

64.     The invoice requested TransRe's 50% share of "Paid Loss" (which applies to the next $4 million of loss payments under the 1981 Umbrella Policy) above the first $1 million paid by Amerisure under the umbrella, which totaled $32,894.50.  The invoice also requested TransRe's prorated share of loss expense, which totaled $72,385.34.

65.     TransRe did not pay the invoice, nor did it pay later invoices it received from Amerisure.

66.     Amerisure's most recent invoice dated July 2021 requested a total under the 1981 Facultative Certificate now due of $1,303,815.00 for Paid Loss recoverable and $1,945,509.89 for Paid Loss Adjustment Expense recoverable.

67.     TransRe has not paid any invoices for amounts due in respect of TransRe's share of both loss and loss expense under the 1981 Facultative Certificate.

68.     As of the date of this second amended complaint, the outstanding principal balance due to Amerisure from TransRe under the 1981 Facultative Certificate is $3,249,324.89.

69.     Amerisure is informed by its experience with Armstrong claims, and therefore believes that amounts will be due under the 1982 Facultative Certificate at a later date.

**TransRe Contends Expense Erode Limits and Seeks to Avoid Obligations**

70.     TransRe asserts that the Reinsurance Accepted provisions of each of the Facultative Certificates provides for a limit to the amount that may be paid under the agreements, regardless of whether the amounts stated are reached by payment of loss or loss expense.

71.     Because the terms of the Facultative Certificates which follow the Umbrella Policies provide otherwise, the parties are in a dispute as to the extent of the obligations that TransRe owes under the Facultative Certificates.

**TransRe has Paid Armstrong Invoices Under other Reinsurance Contracts**

72.     In 2014, Amerisure invoiced TransRe in connection with its participation in two Third General Casualty Excess of Loss Reinsurance Agreements issued to Amerisure in 1988 and 1989 ("Third XOL").

73.     The 2014 invoices included (but were not necessarily limited to) asbestos-related losses and loss expenses paid by Amerisure under general liability policies issued to Armstrong in 1988 and 1989.

74.     The loss and loss expense invoiced related to Armstrong's nationwide asbestos litigation, which is also the subject of the invoices issued in respect of the 1981 Facultative Certificate, and the notices that have been issued in respect of both the 1981 and 1982 Facultative Certificates for the past six years.

75.     The reinsurance agreements were the expense inclusive type, where loss and loss expense erode the limits of the reinsurance, unlike the Facultative Certificates.

76.     TransRe paid the billings in the total amount of $52,633.60 in December 2014 without objecting to "late" notice or on any other basis.

**TransRe "Partially" Denied Amerisure's Claim and Has Refused to Pay in Bad Faith**

77.     The parties to a reinsurance agreement owe one another a duty of utmost good faith. This is a mutual obligation.

78.     Since on or around 1980, TransRe has entered into about 51 reinsurance treaties and 138 facultative certificates reinsuring Amerisure.  Until the 2017 invoice, TransRe had more or less timely paid invoices that Amerisure presented to it under such agreements and had not asserted "late notice" to Armstrong asbestos loss.

79.     When TransRe received the Notice of Loss in March 2014, it did not accept Amerisure's reserve calculations.

80.     TransRe did not respond to the initial Notice of Loss until May 2015, fifteen months later, when it requested from Amerisure additional information about the underlying claims under both the Third XOL and the Facultative Certificates. Amerisure provided additional information and began sending TransRe quarterly reports on the Armstrong claims.

81.     TransRe then twice issued a "partial" denial of Amerisure's claim under the Facultative Certificates, saying that it would pay outstanding losses, as well as future losses subject

to a fifteen percent (15%) discount (still requiring that expense be paid within the Reinsurance Accepted amounts).

82.     TransRe's "partial" denials reflected TransRe's acceptance of at least some (as yet unidentified) portion of Amerisure's claim.

83.     TransRe uses partial denials as a tactic and as part of a well-developed strategy to force a compromise from its cedent in order to save money.

84.     TransRe's willingness to pay a fifteen percent (15%) discount for future losses was an admission that at least eight five percent (85%) of the claim was covered.

85.     However, TransRe has still refused to pay *any* amounts under the Facultative Certificates.

86.     Amerisure was represented in the Third XOL and in the Facultative Certificates by certain reinsurance brokers or "intermediaries."   Beginning in 2006, Amerisure directed its intermediary to provide notice to all of Amerisure's treaty reinsurers of Armstrong GL policies of developing Armstrong losses, including TransRe. TransRe thereby received actual or constructive notice of the Armstrong claims under the Facultative Certificates.

87.     Amerisure provided notice of the Armstrong claims to its other facultative reinsurers participating in the reinsurance of Amerisure's 1981 and 1982 coverage of Armstrong at the same time it provided TransRe notice in 2014. No other Amerisure reinsurer has pursued a defense of late notice in litigation or arbitration in connection with Armstrong-related claims, or otherwise asserted late notice to avoid obligations in relation to Armstrong-related claims.

88.     In addition, in denying Amerisure's claim, TransRe (a New York domiciled reinsurer) asserted that New York law applied to the dispute and relied on a decision that has since been unequivocally disavowed by the Second Circuit of Appeal and the New York Court of

Appeals, and which decision did not reflect reinsurance industry custom and practice in 1981-1982. TransRe has been fully aware of these decisions and nevertheless has wrongfully maintained its position that its total liability for loss and expense under the Facultative Certificates is capped by the Reinsurance Accepted amount.

89.     For the reasons stated herein, TransRe's continued refusal to honor its obligations under the Facultative Certificates is a breach of its duty of utmost good faith to Amerisure and constitutes a bad faith denial of Amerisure's claim.

### TransRe Denied Amerisure's Claim to Pressure Amerisure to Commute Its Asbestos Liabilities for Less Than Fair Market Value

90.     During this litigation, Amerisure discovered TransRe's true motivation for denying Amerisure's claim: to pressure Amerisure into commuting TransRe's asbestos liabilities for less than fair market value.

91.     Unbeknownst to Amerisure, in September 1980, TransRe decided not to reinsure asbestos liabilities.

92.     TransRe purposefully concealed its decision not to reinsure asbestos liabilities from its cedents, including Amerisure, because it did not want to cause stir or consternation in the marketplace and set itself apart from other reinsurers.

93.     After September 1980, TransRe continued to enter into facultative certificates that did not include an asbestos exclusion, including the Facultative Certificates.

94.     During the process of underwriting the Facultative Certificates, TransRe did not ask about asbestos and did not tell Amerisure that it would not reinsure any product containing asbestos.

95.     Many of the facultative certificates TransRe entered into that did not include asbestos exclusions were with companies that ultimately became Tier 1 asbestos defendants.

96.     In or around (and most likely prior to) 2016 (two years after Amerisure notified TransRe of developing asbestos liabilities), TransRe developed a list of "1985 and prior risk cedents", which are cedents with potential asbestos liabilities that arose out of occurrences in 1985 and prior years. TransRe developed this list in order to pursue commutation agreements with cedents who have potential asbestos liabilities.

97.     A commutation agreement is an agreement in which the reinsurer and the ceding company agree on the conditions under which all of the reinsurer's obligations under a reinsurance agreement are discharged in consideration of a monetary payment to the cedent.

98.     TransRe has been pursuing such commutation agreements in order to eliminate its potential asbestos liabilities under its reinsurance contracts with such cedents.

99.     TransRe specifically identified Amerisure as a "1985 and prior risk cedent".

100.    Prior to this litigation, TransRe never pursued a commutation agreement with Amerisure and never informed Amerisure of its interest in any such transaction with Amerisure.

101.    Upon information and belief, TransRe instead denied Amerisure's claim, and then undertook the bad faith litigation tactics described below, in order to pressure Amerisure to commute its business with TransRe for less than fair value.

**TransRe Has Engaged in a Pattern and Practice of Bad Faith Conduct in the Marketplace**

102.    Amerisure is informed from material discovered during the course of this litigation, and therefore believes that TransRe has similarly denied the claims of other "1985 and prior risk cedents" in order to pressure those cedents to commute its business with TransRe for less than fair value, including, but not limited to, the following:

(a)     Numerous TransRe cedents sued TransRe alleging that, after 2012 (when TransRe was purchased by Allegheny Corporation), TransRe improperly refused to pay any amounts billed under a number of facultative certificates reinsuring 1980, 1981, 1982, and 1983 excess liability policies (in other words, asbestos liabilities)—even

where TransRe paid amounts under the same facultative certificates prior to 2012. Such refusal evidences not just TransRe's practice of customarily rejecting such claims, but also a motive to avoid paying for asbestos liabilities, even though it is responsible for such liabilities under its facultative certificates.

(b)  One cedent specifically claimed that their case is "merely one example of TransRe's broader, continuing pattern and practice of abusive, bad-faith claims conduct" and point to TransRe's shifting justifications for its failure to pay as evidence of TransRe's bad-faith conduct.

(c)  Two other cedents claimed that TransRe sought to commute its asbestos-related reinsurance obligations with a group of the cedent clients "at an irrationally high discount." TransRe allegedly "intimated that Transatlantic would withhold funds due" to [such] insurer-clients if they refused to enter into the commutation. After the clients declined to commute, TransRe began refusing to pay claims submitted by [such clients] in order to force [them] to agree to commute TransRe's obligations "at a below-market and irrational price".

(d)  Other cedents made similar allegations in its complaint against TransRe.

103.  Such tactics are in violation of TransRe's duty of utmost good faith to its cedents, including Amerisure.

## TransRe Has Engaged in Bad-Faith Litigation Tactics Further Designed to Pressure Amerisure to Commute Its Asbestos Liabilities for Less Than Fair Market Value

104.  In further breach of its duty of utmost good faith owed to Amerisure and in bad faith, TransRe has engaged in tactics to delay and increase the cost of this litigation in order to pressure Amerisure to settle or commute TransRe's obligations under the Facultative Certificates for less than fair value, including, but not limited to the following:

(a) Insisting that the parties engage in prolonged and expensive discovery on an issue TransRe later argued on summary judgment required no discovery;

(b) Luring Amerisure into commutation negotiations that resulted in a seven-month delay of this litigation and continued nonpayment of amounts due to Amerisure, ultimately withdrawing from the negotiations without ever making any offer;

(c) Asserting baseless and constantly shifting "defenses" to Amerisure's claim for payment, resulting in prolonged, unnecessary, and expensive discovery.

105.    TransRe's bad faith conduct described herein is directed at Amerisure, is of an egregious nature in that it is gross and involves high moral culpability, and it is actionable as an independent tort.

106.    TransRe's bad faith conduct described herein is part of a pattern directed at the reinsurance marketplace generally. Insurance and reinsurance are highly regulated in order to ensure financial protection of insureds like Armstrong and claimants against them, and their insurers.  Such protection inures to the public generally and directly.  As alleged herein, TransRe has engaged in the same bad faith conduct with other cedents.

107.    Amerisure is entitled to punitive damages for breach of contract, including but not limited to attorneys' fees and costs incurred in bringing this action.

## COUNT I
### Breach of Contract

108.    Amerisure repeats and incorporates by reference the allegations set forth in paragraphs 1 through 107 as if fully set forth herein.

109.    Amerisure has fully performed its obligations under the 1981 Facultative Certificate and has properly billed TransRe for amounts due thereunder.

110.    In breach of the 1981 Facultative Certificate, TransRe has refused to pay Amerisure's invoices.

111.    As a result of TransRe's breach of the 1981 Facultative Certificate, Amerisure has suffered and will continue to suffer damages until TransRe pays its invoiced obligations, including but not limited amounts paid for covered loss judgments and/or settlements; capital charges resulting from statutory accounting penalties, related defense and supplementary payments for taxed costs and interest; attorneys' fees and other expenses incurred in defending Armstrong; and accrued interest.

## COUNT II
### Declaratory Relief

112.    Amerisure repeats and incorporates by reference the allegations set forth in paragraphs 1 through 107 as if fully set forth herein.

113.    Amerisure will continue to make payments on Armstrong's behalf pursuant to the terms of the 1981 Umbrella Policy, and such payments will be subject to reimbursement in proportionate share from TransRe under the 1981 Facultative Certificate.

114.    In failing to pay amounts due under the 1981 Facultative Certificate, TransRe has breached that contract and indicated an intention to continue to breach.

115.    TransRe also rejects its obligation to pay its calculated share of loss expenses to the extent such amounts exceed those identified in the Reinsurance Accepted provisions of the Facultative Certificates Declarations (both 1981 and 1982).

116.    In other words, TransRe asserts that once its Reinsurance Accepted amounts have been paid in any combination of loss and loss expense paid, its obligation ends under terms of the Facultative Certificates.

117.    An actual and justiciable controversy exists between Amerisure and TransRe as to which the Court has jurisdiction to adjudge the parties' respective rights and obligations under the Facultative Certificates pursuant to 28 U.S.C. § 2201.

118.    Amerisure is entitled to a judicial determination of the parties' rights and obligations under the Facultative Certificates, including a declaration that TransRe is obligated to pay Amerisure's future billings, and that the limits of such contracts are exhausted only by the payment of the Reinsurance Accepted amount by "loss" settlements, while the payment of "loss expense" must be paid in addition to such amounts unless and until such Reinsurance Accepted amount is exhausted by payment of loss.

**COUNT III**
**Bad Faith**

119.    Amerisure repeats and incorporates by reference the allegations set forth in paragraphs 1 through 107 as if fully set forth herein.

120.    As alleged herein, TransRe's denial of Amerisure's claim for coverage, and TransRe's other conduct described above, has been undertaken in bad faith and amounts to a breach of its duty of utmost good faith.

121.    TransRe has no reasonable basis to challenge Amerisure's claim for coverage.

122.    Under these facts, no reasonable insurer would challenge Amerisure's claim for coverage.

123.    As a result of TransRe's bad faith denial of Amerisure's claim, Amerisure is entitled to its attorneys' fees and costs expended in bringing this action.

**COUNT IV**
**Violation of N.Y. Gen. Bus. Law § 349**

124.    Amerisure repeats and incorporates by reference the allegations set forth in paragraphs 1 through 107 and paragraphs 120 through 123 as if fully set forth herein.

125.    N.Y. Gen. Bus. Law § 349 makes it unlawful to engage in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

126.    TransRe's principal place of business is located in the State of New York, and TransRe is subject to New York law, including (without limitation) New York General Business Law and New York Insurance Law.

127.    Through the bad faith conduct described herein, TransRe has violated New York Insurance Law § 2601, which constitutes a violation of N.Y. Gen. Bus. Law § 349.

128.    Through its bad faith conduct described herein, TransRe has not attempted in good faith to effectuate any prompt, fair or equitable settlements of claims submitted in which liability has become reasonably clear and as to which it has issued only "partial" denials.

129.    TransRe's bad faith conduct has impacted consumers at large and is consumer-oriented. As part of a pattern and practice, TransRe has improperly refused to pay any amounts billed under a number of facultative certificates reinsuring 1981 and 1982 excess liability policies, including the Facultative Certificates, in order to force Amerisure (and other TransRe cedents) to commute valid asbestos claims and liabilities for less than fair market value.

130.    At all times material, TransRe's bad faith conduct was and continues to be misleading in a material way. TransRe has concealed its true motivations for denying valid claims.

131.    Amerisure has suffered damages as a result of TransRe's bad faith conduct.

132.    Amerisure is entitled to punitive damages for TransRe's violation of N.Y. Gen. Bus. Law § 349, including but not limited to attorneys' fees and costs incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amerisure Mutual Insurance Company requests that the Court enter judgment in its favor and against TransRe as follows:

A.    Awarding amounts billed to Trans Re under the 1981 Facultative Certificate for loss and related defense and supplementary payments for taxed costs and interest, attorneys' fees and other expenses incurred in defending Armstrong;

B.    Declaring that: (i) TransRe is obligated to pay future billings by Amerisure for its portion of Amerisure's payments under the 1981 Umbrella Policy that TransRe reinsured pursuant to the 1981 Facultative Certificate; (ii) pursuant to both the 1981 and 1982 Facultative Certificates, TransRe is obligated to reimburse Amerisure for TransRe's portion of loss expense in addition to

loss amounts; and (iii) loss payments are the only payments to which the purported Reinsurance

Accepted amounts apply.

  C.  Awarding capital charges resulting from statutory accounting penalties incurred by

Amerisure, accrued pre-judgment and post-judgment interest, attorneys' fees and costs incurred in

this action, punitive damages, and such other and further relief as this Court deems just and proper.

Dated: November 29, 2021     Respectfully Submitted,

                   **Amerisure Mutual Insurance Company**

                   By: */s/ Stephen W. Schwab*
                      One of Its Attorneys

Lori McAllister (P39501)
DYKEMA GOSSETT PLLC
Capitol View
201 Townsend Street
Suite 900
Lansing, MI 48933
517.374.9100
lmcallister@dykema.com

Stephen W. Schwab
Emily D. Gilman
Matthew Freilich
DLA PIPER LLP (US)
444 West Lake Street
Suite 900
Chicago, IL 60606
312.368.4000
stephen.schwab@us.dlapiper.com
emily.gilman@us.dlapiper.com
matt.freilich@us.dlapiper.com

Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

Stephen W. Schwab, an attorney, certifies that on the 29th day of November, 2021, he caused the foregoing **SECOND AMENDED COMPLAINT** to be filed with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Timothy J. Jordan (P46098)
GARAN LUCOW MILLER, P.C.
tjordan@garanlucow.com

Ronie M. Schmelz
Chelsea M. Croy Smith
Chelsea Mikula
TUCKER ELLIS LLP
ronie.schmelz@tuckerellis.com
Chelsea.Miluka@tuckerellis.com
Chelsea.Croy@tuckerellis.com


*/s/ Stephen W. Schwab*
Stephen W. Schwab